UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JEELINE E. SPEARS,

                Plaintiff,

v.                                           Case No. 20-cv-894-pp

KEVIN TYLER, MARKEESE YOUNG,
JEFF ANDRYKOWSKI, JOHN DINGMAN,
DANIEL CARROLL, CYRUS PAYNE,
BRANDON MCDONALD, and KEVIN UTSBY,

                Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 61)**

---

      Plaintiff Jeeline Spears, who is representing himself, filed a complaint alleging that the defendants used excessive force against him on July 26, 2018, when he was confined at the Milwaukee County Jail. Dkt. No. 1. The court screened the complaint under 28 U.S.C. §1915A and allowed the plaintiff to proceed on an excessive force claim under either the Eighth or the Fourteenth Amendment (it was not clear whether the plaintiff was a pretrial detainee or a convicted prisoner when the incident occurred). Dkt No. 13 at 5-6. The plaintiff subsequently filed an amended complaint identifying the former Doe defendants; the amended complaint is the operative complaint. Dkt. No 31. The defendants since have filed a motion for summary judgment. Dkt. No. 61. The court will grant in part and deny in part the defendants' motion.

1

## I. Facts[1]

On July 26, 2018, the plaintiff was transported from the Milwaukee Secure Detention Facility to the Milwaukee County Jail to complete the balance of a revocation sentence that followed a prior conviction. Dkt. No. 74 at ¶1. At the time of the events described in the complaint, defendants Lt. Kevin Tyler, C.O. Markeese Young, C.O. Jeff Andrykowski, C.O. John Dingman, C.O. Daniel Carroll, C.O. Cyrus Payne, C.O. Brandon McDonald and C.O. Kevin Utsby worked as correctional officers at the jail. Id. at ¶2.

When the plaintiff arrived at the jail, NP Nathan Adams (not a defendant) conducted a medical review and determined that the plaintiff would be placed on a "suicide watch" due to a policy that required inmates to be placed on suicide watch when they arrived from another facility and had not been off suicide watch status from the prior facility for at least thirty days. Id. at ¶¶3-4. Twenty-eight days earlier, while housed at the Milwaukee Secure Detention Facility, the plaintiff had been placed on suicide watch due to an intentional acetaminophen poisoning. Id. at ¶6. Adams notified Lt. Tyler that he had

---

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c). The defendants filed proposed findings of fact. Dkt. No. 74. The plaintiff's response to the defendants' proposed findings of fact indicates that he disputes portions of the defendants' version of the events that took place on July 26, 2018. Dkt. No. 80. The defendants contend that the plaintiff has not properly supported his disagreements with their proposed facts. Dkt. No. 86 at 1-2. To the extent the plaintiff cites to his verified amended complaint, he has properly supported his disputes because at the summary judgment stage, the court considers his verified amended complaint as an affidavit. See Devbrow v. Gallegos, 735 F.3d 584, 587 (7th Cir. 2013) (citing 28 U.S.C. §1746; Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996)); see also Lewis v. McLean, 864 F.3d 556, 561 (7th Cir. 2017) (verified complaint is "the equivalent of an affidavit for purposes of summary judgment").

placed the plaintiff on suicide watch. Id. at ¶7. When the plaintiff learned that he would be placed on suicide watch, he approached the booking desk and said he refused to go on suicide watch. Id. at ¶8.

### A. Booking Area

The parties dispute what happened next. According to the defendants, Tyler ordered the plaintiff to sit down in a chair, but he continued to stand near the desk while stating, "I ain't complying you gotta do what you gotta do." Id. at ¶9. The plaintiff was ordered several times to take a seat in a chair; the defendants do not say by whom. Id. at ¶10. Tyler ordered C.O.s Young, Utsby and Payne to place the plaintiff in a restraint belt (RIPP™ belt) with cuffs for his wrists. Id. at ¶11. While staff attempted to place the plaintiff in the restraint belt, he resisted by tensing up and pulling his arms away. Id. at ¶13. Officers ordered the plaintiff to stop resisting, but he continued to actively resist being placed in the restraint belt. Id. at ¶¶14-15. Tyler and Young then directed the plaintiff to the wall so that he could be secured in the restraint belt. Id. at ¶16.

According to the plaintiff, after a mental health staff member told him he was going on suicide watch, he said, "I'm not going on suicide watch, I'm not suicidal." Dkt. No. 31 at ¶11. The plaintiff states that he then walked out of the mental health office and sat down in the booking area. Id. at ¶12. Ten seconds later, mental health staff informed Tyler what the plaintiff had said. Id. at ¶13. Payne then ordered the plaintiff to sit in the blue chair, the plaintiff immediately complied and Payne came over and had a "very relaxed and friendly conversation about the policy and the need to comply with it." Id. at

3

¶¶14-15. The plaintiff informed Payne that he did not feel suicidal and that he believed suicide watch was not necessary. Id. at ¶16. Without warning or provocation, Tyler approached the plaintiff and Payne and stated aggressively, "Fuck that! He's going on suicide watch!" Id. at ¶17. Tyler grabbed the plaintiff under the right arm, stood him up, pushed him toward the wall and then, with one hand under the plaintiff's arm and the other on the back of his head, slammed his head and body into the wall which caused excruciating pain to the plaintiff's head and face. Id. at ¶¶18-20. The plaintiff feared that his life was in jeopardy and he started resisting orders. Id. at ¶21.

According to the plaintiff, while Tyler held him against the wall, Young and C.O. Utsby fastened a "Ripp belt" around the plaintiff's waist and placed handcuffs on him.[2] Dkt. No. 31 at ¶22. After being placed in the restraint belt, the plaintiff went to the fingerprint and photo area for processing. Dkt. No. 74 at ¶18.

### B. Fingerprint and Photo Area

The plaintiff resisted Young's and C.O. Dingman's attempts to take his fingerprints. Dkt. No. 74 at ¶22. Officers held the plaintiff's face for the booking photos because he did not comply with his photo being taken. Id. at ¶21.

According to the plaintiff, while he resisted his fingerprints being taken, Young and Dingman bent his hands and fingers which caused excruciating

---

[2] The defendants state that Utsby and *Payne* assisted in securing the plaintiff into the restraint belt. Dkt. No. 74 at ¶17.

4

pain. Dkt. No. 31 at ¶24. He also states that, while resisting, his hands were hit with a closed fist. Id. at ¶25.

Tyler then ordered staff to take the plaintiff to Housing Unit 4D. Dkt. No. 74 at ¶23.

C. Cell 23 and Nurse Assessment

The plaintiff was taken to Cell 23 where officers attempted to tether him to the door while he continued to actively resist by using "dead weight tactics." Dkt. No. 74 at ¶24.[3] At about 1:30 a.m., C.O. Carroll "tapped out" Tyler to try to calm the situation because the plaintiff was focusing on Tyler. Id. at ¶25. Once inside the cell, staff gave verbal commands to the plaintiff for about five minutes to cooperate with the process of changing into a suicide gown. Id. at ¶¶26-27. When the plaintiff did not follow the verbal commands to change himself, officers stabilized the plaintiff against the wall in the cell so that the officers could cut off his clothes and place him in the suicide gown. Id. at ¶28.

During the changeover process, Dingman secured the plaintiff's head against the wall so that he could not harm himself. Dkt. No. 74 at ¶29. While still in the restraint belt, officers removed the plaintiff from the cell and walked him to the 4D workstation area where medical staff assessed him at his

---

[3] The plaintiff states that he disputes this fact and that he was not tethered to the door but was thrown in the cell and beat up until he vomited on himself. Dkt. No. 86 at ¶24. The plaintiff cites to his amended complaint, which describes an interaction with C.O. Andrykowski that happened after the interaction the defendants describe here. The court addresses this incident in the next section.

5

request. Id. at ¶30. Staff took photographs of the plaintiff's face and wrists. Id. at ¶31.

### D. Return to Cell 23, Medical Staff Evaluation and Cell 10

After the medical assessment, the plaintiff returned to Cell 23. Dkt. No. 74 at ¶32. Because the plaintiff was using "deadweight tactics," the officers utilized a trained technique of walking him backwards to the cell door. Id. at ¶33. The plaintiff continued to resist entering the cell by using deadweight tactics and kicking against the cell door.[4] Id. at ¶34. Staff ordered the plaintiff to stop resisting, but he refused. Id. at ¶35.

Jail policy requires that a restraint belt be removed before an inmate can be left alone in his cell. Dkt. No. 74 at ¶37. According to the defendants, once inside the cell, C.O. Andrykowski decentralized the plaintiff onto the bed and used "body weight tactics" so the restraint belt could be removed. Dkt. No. 74 at ¶36. The plaintiff resisted having the restraint belt removed by clenching his fists together so that the handcuffs would not come off. Dkt. No. 74 at ¶38. Dingman secured the plaintiff's legs while Andrykowski secured his head and Young and Carroll attempted to remove the restraint belt. Id. at ¶39. The

---

[4] The plaintiff states that he disputes this fact and that the video in Housing Unit 4D has been destroyed. Dkt. No. 80 at ¶¶34-35. The defendants, however, submitted the video evidence as Exhibit B to James Novotny's Declaration. Dkt. No. 65. The video of Housing Unit 4D, timeframe 1:32:13 to 1:33:15, shows that officers struggled with the plaintiff before he entered the cell. Dkt. No. 86 at ¶34. The court previously denied the plaintiff's motion to compel the 4D cell block video footage because the defendants already had provided him with a flash drive and a CD of the existing 4D cell block video footage. Dkt. No. 59 at 2, 5-6.

plaintiff kicked at staff and attempted to bite Andrykowski. Id. at ¶40. Young eventually was able to remove the restraint belt from the plaintiff. Id. at ¶41.

According to the plaintiff, once in the cell, Andrykowski lifted him in the air from behind and slammed him on the bed and floor "for no apparent reason and without provocation." Dkt. No. 80 at ¶36.[5] The plaintiff also states that he was beaten repeatedly and then the restraint belt was removed. Id. The plaintiff states that Utsby, Young, Andrykowski, Dingman and C.O. McDonald struck him with closed fists, their feet, knees and elbows to all parts of his body for about five minutes. Dkt. No. 31 at ¶29.

At some point, the plaintiff vomited. Dkt. No. 74 at ¶42; Dkt. No. 80 at ¶42. Staff secured the plaintiff with emergency handcuffing and removed him from the cell so he could again be evaluated by medical staff in the 4D workstation area. Dkt. No. 74 at ¶¶43-44.

According to the defendants, the plaintiff refused medical treatment and began yelling at the medical staff. Dkt. No. 74 at ¶45. The plaintiff states that the nurse refused to take photos of his body. Id. Staff then transported the plaintiff to Cell 10, where he was placed on suicide watch without further incident. Dkt. No. 74 at ¶¶46-47.

---

[5] The plaintiff's response states that there is no video of this, but the defendants submitted a video of Unit 4D as Exhibit B to Novotny's Declaration. Dkt. No. 65. The video of Housing Unit 4D Sub Pod C, timeframe 1:33:15 to 1:39:45, shows the timeframe that Andrykowski decentralized the plaintiff onto the bed and used body weight tactics so the restraint belt could be removed. Dkt. No. 86 at ¶36.

7

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. <u>Discussion</u>

The defendants contend that the plaintiff was a convicted prisoner when the incident occurred and that the Eighth Amendment excessive force standard applies to his claims. Dkt. No. 62 at 10-11. The plaintiff contends that the defendants violated his rights under the Eighth *and* Fourteenth Amendments, and states he was at the jail on a misdemeanor charge for which he had not yet been convicted. Dkt. No. 79 at 2. It is undisputed that the plaintiff was transferred to the jail to continue the sentence that previously had been imposed due to a probation revocation. Dkt. No. 74 at ¶1. The defendants have submitted evidence that on March 26, 2018, the plaintiff's probation was revoked in Milwaukee County Case Number 16CF2782 and that on July 23, 2018, the secretary designee of the Wisconsin Department of Corrections ordered the plaintiff to return to the jail to complete the balance of his revocation sentence in that case. Dkt. No. 65-1 at 1-2, 7. That the plaintiff may also have been accused of another charge does not negate his status as a convicted prisoner on July 23, 2018. The Eighth Amendment applies to the plaintiff's excessive force claims. See <u>Kingsley v. Hendrickson</u>, 576 U.S. 389, 396-97 (2015).

The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits "unnecessary and wanton infliction of pain" on prisoners. <u>Hudson v. McMillian</u>, 503 U.S. 1, 5 (1992). In cases involving the use of excessive force, the question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Id.</u> at 7.

Factors for courts to consider in determining whether the use of force was wanton and unnecessary include "the need for an application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" Id. (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)).

Often circumstances require prison officials to balance the need "to maintain or restore discipline" with the use of force and the risk of injury to inmates. Hudson, 503 U.S. at 6. Both situations require officials to act quickly and decisively. Id. Likewise, both implicate the principle that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Id. (internal citations and quotations omitted.)

In Hudson, the Supreme Court made clear that not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9. The Eighth Amendment's prohibition against cruel and unusual punishments excludes from constitutional recognition *de minimis* uses of force that are not of the kind that would be "repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). But the Court also clarified that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident." Hudson, 503 U.S. at

10

9. The extent of injury is relevant to the Eighth Amendment inquiry because it provides some indication of the amount of force applied and because it may suggest whether the use of force was plausibly necessary in a particular situation, but the absence of serious injury is not the end of the analysis. Wilkins v. Gaddy, 559 U.S. 34, 37 (2010).

        1.    *Booking Area*

A reasonable fact finder could conclude that Tyler used excessive force when, based on the plaintiff's version of the incident, he approached the plaintiff and grabbed him, pulled him up from his chair, pushed him to the wall and slammed his head against the wall. The plaintiff states that Tyler took this action after the plaintiff had immediately followed Payne's order to sit in a chair, and as the plaintiff and Payne were having a "relaxed and friendly" conversation about the suicide watch policy. Under the plaintiff's version of events, the plaintiff posed no threat and Tyler arguably had no need to apply force, let alone the assaultive force the plaintiff described. The defendants assert that a photograph of the plaintiff shows that he did not suffer any injury from Tyler's actions. The court disagrees. While the black and white photograph does not reveal that the plaintiff has a black eye from Tyler's actions, it does appear to show that the area surrounding his right eye was swollen. Dkt. No. 65-2 at 1. And a "prisoner need not show a 'significant injury' in order to have a good claim under the [E]ighth [A]mendment, if a guard inflicted pain maliciously or sadistically." Guitron v. Paul, 675 F.3d 1044, 1046 (7th Cir. 2012) (citing Hudson, 503 U.S. at 7). The court will deny the

11

defendants' motion for summary judgment as to the plaintiff's claim Tyler slammed his head against the wall in the booking area.[6]

On the other hand, construing the facts in the light most favorable to the plaintiff, a jury could not conclude that Young, Utsby or Payne used excessive force while in the booking area because, at most, they placed the plaintiff in restraints after Tyler allegedly slammed him against wall. The plaintiff does not claim that they participated in Tyler's actions or that they used unreasonable or excessive force while placing the restraints on him. To the extent the plaintiff claims that Young, Utsby and Payne used excessive force on him in the booking area, the court will grant the defendants' motion for summary judgment.

2. *Fingerprints and Photo Area*

The plaintiff states that he started resisting after the incident with Tyler and it is undisputed that the plaintiff resisted officers in the fingerprint and photo area. Based on the plaintiff's resistance to officers' attempts to take his fingerprints and photograph, a reasonable factfinder could not conclude that Young and Dingman used excessive force in their attempts to take his fingerprints. In addition, the plaintiff has not shown that any defendant used

---

[6] The court previously denied the plaintiff's motion to compel the video from booking room area; in that motion, he argued that the defendants did not take reasonable steps to preserve the video. Dkt. No. 59 at 2-3. The defendants argued that the video was not preserved because it was determined that there was no use of force while the plaintiff was in booking area and Milwaukee County policy is to preserve video when officers use force. Id. at 3. The plaintiff has not been prejudiced by the absence of the video because he has described the use-of-force incident in his verified complaint and responses to the defendants' proposed statements of fact.

12

excessive force in attempting to stabilize his head to take the booking photo, during which time he also admits that he resisted. While the plaintiff states that it was very painful when Young and Dingman bent his fingers back to try to take his fingerprints and that it hurt his neck when officers had to hold his head for the booking photograph, the plaintiff has not presented evidence that these officers used force that was malicious or sadistic. See Guitron v. Paul, 675 F.3d 1044, 1046 (7th Cir. 2012) ("Custodians must be able to handle, sometimes manhandle, their charges, if a building crammed with disgruntled people who disdain authority ... is to be manageable."). The court will grant the defendants' motion for summary judgment regarding the plaintiff's claim that officers used excessive force to take his fingerprints and photograph.

    3.  *Cell 23 and Nurse Assessment*

When the plaintiff first arrived at Cell 23, he resisted putting on a suicide gown, so staff restrained him, cut off his clothes, placed the suicide gown on him and took him to see the nurses. The undisputed facts do not support a claim that any defendant used excessive force on the plaintiff during this stage of the incident and the plaintiff does not appear to contend that any defendant used excessive force against him during this time. The court will grant the defendants' motion for summary judgment regarding the force used to place the suicide gown on the plaintiff.

    4.  *Return to Cell 23*

When the officers escorted the plaintiff back to Cell 23, he used "deadweight tactics," so the officers used the technique of walking him

13

backwards. Once at the cell, the officers struggled with the plaintiff before he entered the cell. Once the plaintiff entered the cell, Andrykowski decentralized the plaintiff on the bed—the plaintiff describes this as an unprovoked "slamming." The court disagrees with the plaintiff's description of Andrykowski's actions as "unprovoked" because the plaintiff had struggled with the officers at his cell door moments earlier when they were trying to get him into the cell.

Once in the cell and down on the bed, the officers had to remove the restraint belt. The defendants assert that they struggled with the plaintiff to get the belt off him while the plaintiff asserts that during this time, the officers beat him by striking him all over his body with closed fists and with their knees, feet and elbows. During these several minutes, the video shows officers standing over and around the plaintiff. The viewer cannot see the plaintiff himself because the officers are standing over and around him. The plaintiff's version of this incident, however, is not consistent with what the video shows. If the officers had been striking, kicking and kneeing him all over his body in the manner he described, that would be evident from the video.

If the only evidence presented to the court were the parties' conflicting statements, there might be a genuine dispute of material fact for a jury to decide. If a jury were to credit the plaintiff's version—that officers struck him, kicked him and kneed him for several minutes while he lay on the bed or floor in restraints—it is unlikely that a jury would have found that level of force justified. See Fillmore v. Page, 358 F.3d 496, 504 (7th Cir. 2004) (noting that

14

the infliction of pain is *per se* malicious if it is done "totally without penological justification"); Lewis v. Downey, 581 F.3d 467, 477-78 (7th Cir. 2009).

The parties' statements, however, are not the only evidence before the court. The defendants have provided a video of the incident, which they argue directly contradicts the plaintiff's version of the events. The Supreme Court has held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 378-81 (2007). The Seventh Circuit has indicated that not every movement must be captured on a video for a court to find that it blatantly contradicts a particular version. See Boyd v. Pollard, 621 Fed. App'x 352, 355-56 (2015) (stating, "We conclude that no juror who viewed the video could reasonably conclude—given the professional behavior of the guards and minor injury sustained by Boyd—that the guards, when outside the camera's view, attacked Boyd.") In that decision, the court reemphasized that summary judgment is proper only if a jury reasonably could find excessive force after reconciling the entirety of the plaintiff's assertions with the video evidence. Id.

The defendants had just returned from a medical assessment for the plaintiff. The video shows their attempts to return him to Cell 23 in a controlled manner. Once in the cell, they needed to get the restraints off the plaintiff. Based on the video evidence, a reasonable factfinder could not conclude that any defendant used force maliciously or sadistically because the video does not

15

show that the defendants engaged the actions the plaintiff described. The court will grant the defendants' motion for summary judgment as to the plaintiff's claim that they used excessive force when he returned to Cell 23.

### III. Qualified Immunity

The defendants have argued that they are entitled to qualified immunity. Qualified immunity "protects government officials from suit for damages when their conduct does not violate clearly established statutory or constitutional rights." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Determining whether a state official is entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." Williams v. City of Chi., 733 F.3d 749, 758 (7th Cir. 2013). If either inquiry can be answered in the negative, the official is entitled to summary judgment.

Courts may address the two prongs of qualified immunity in either order. Pearson, 555 U.S. at 236. A right is clearly established if a "reasonable official would have understood what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012) (internal quotations and brackets omitted). "[T]he crucial question [is] whether the official acted reasonably in the particular circumstances that he or she faced." Kemp v. Liebel, 877 F.3d 346, 351 (7th Cir. 2017)). In this case, the question is whether the plaintiff had a clearly established constitutional right not to be subjected to Tyler's

16

unprovoked slamming of his head and body into the wall while in the booking area.

In Hill v. Shelander, 992 F.2d 714, 718 (7th Cir. 1993), the Seventh Circuit considered whether a reasonable prison official could have reasonably concluded that when an inmate refused to exit his cell, the Constitution permitted that official to pull the inmate from his cell by the shoulder and hair, slam the inmate's head against the bars of an adjacent cell and strike him twice in the face and knee him in the groin. In determining that the officer was not entitled to qualified immunity, the court of appeals reasoned that if the fact finder decided that the prison official acted with malicious intent, "there could be no question that a reasonable prison sergeant should reasonably have known that the conduct described by [the incarcerated plaintiff] violated the eighth amendment." Id. Based on this reasoning, the court concludes that Tyler is not entitled to summary judgment on qualified immunity grounds. See Turner v. Rataczak, 28 F. Supp. 3d 818, 824-25 (W.D. Wis. 2014).

## IV. Conclusion

The court **GRANTS IN PART AND DENIES IN PART** the defendants' motion for summary judgment. Dkt. No. 61. The court denies the defendants' motion as to the plaintiff's claim that Lieutenant Tyler slammed his body and head against the wall in the booking area. The court grants the defendants' motion as to the plaintiff's remaining claims.

The court **DISMISSES** defendants Young, Andrykowski, Dingman, Carroll, Payne, McDonald and Utsby.

17

The plaintiff previously asked the court to appoint counsel to represent him. Dkt. Nos. 11, 40. The court will recruit a lawyer to represent the plaintiff on his surviving claim. The court cautions the plaintiff to be patient; it is often difficult to find lawyers willing and able to represent plaintiffs on a volunteer basis. Once the court has found counsel and the plaintiff has signed a form agreeing to reimburse the *pro bono* fund for expenses, the court will schedule a hearing to discuss next steps.

Dated in Milwaukee, Wisconsin this 26th day of July, 2022.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**